**Jaburg & Wilk, P.C.**
3200 N. Central Avenue, 20th Floor
Phoenix, AZ 85012
602.248.1000

Kraig J. Marton (003816)
kjm@jaburgwilk.com
Laura Rogal (025159)
lar@jaburgwilk.com

Attorneys for Plaintiff

**United States District Court**

**For The District Of Arizona**

| | |
|---|---|
| Jason E. Rappaport, | Case No. |
| Plaintiff, | |
| v. | **Complaint** |
| The Federal Savings Bank, an Illinois Federal Savings Association; Stephen M. Calk, an individual, | **(Jury Trial Demanded)** |
| Defendants. | |

For his Complaint against Defendants The Federal Savings Bank and Stephen M. Calk, Plaintiff Jason E. Rappaport alleges as follows:

1. Plaintiff Jason E. Rappaport resides in the State of Arizona, Maricopa County.

2. Upon information and belief, Defendant The Federal Savings Bank ("TFSB") is a Federal Savings Association based in Chicago, Illinois, and is a citizen of Illinois.

3. Upon information and belief, Defendant Stephen M. Calk ("Calk") is a resident of the State of Illinois.

4. At all times relevant hereto, Defendant Calk was acting on his own behalf, as well as on behalf of Defendant TFSB as an officer, employee, and/or agent acting within the scope of his authority, actual or apparent, or as an alter ego of each other.

5. Complete diversity exists between Plaintiff, a citizen of Arizona, and Defendants, each a citizen of Illinois.

6. Mr. Rappaport brings this Complaint, in part, under the provisions of 28 U.S.C. §§ 2201 and 2202 for declaratory relief regarding the falsity of specific statements of fact that have been made about him by and on behalf of TFSB.

7. This Complaint is also brought pursuant to the Family Medical Leave Act (FMLA), 29 U.S.C.A. § 2601 et seq.

8. This Court has jurisdiction pursuant to 28 U.S.C. § 1332, because complete diversity exists, and the amount in controversy exceeds $75,000. Jurisdiction is also claimed pursuant to 29 U.S.C.A. § 2617 (FMLA); 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1367(a) (supplemental jurisdiction).

9. This Court is the proper venue under 28 U.S.C. § 1391, because all Plaintiff resides in the District of Arizona and a substantial part of the events from which the claims in this Complaint arose occurred in the District of Arizona.

### General Allegations

10. Mr. Rappaport has been in the lending industry for nearly thirty years.

11. Mr. Rappaport began working in affinity lending nearly twenty-five years ago with his business associate, Dean Sourial.

12. Together they developed ICC Mortgage Services, which funded billions of dollars in residential home loans through homebuyer education, relocation, first-time homebuyer programs, down payment assistance programs, construction and bridge loans, and home loans.

13. Mr. Rappaport and Mr. Sourial invested their time, money, and efforts over the decades to not only establish, but maintain and enhance these relationships.

14. They were personally vetted by many organizations, including the New York Police Department (NYPD); they also obtained federal security clearance through U.S. Customs and Border Protection.

2

15. Upon information and belief, Defendant Calk is the founder, Chairman and Chief Executive Officer of TFSB.

16. TFSB recruited Mr. Rappaport in April 2016 to be its Senior Regional Vice President, based on his significant book of business.

17. In hiring Mr. Rappaport, TFSB sought to take advantage of the voluminous business relationships that had been originated, grown, and flourished due to the direct efforts of Mr. Rappaport.

18. TFSB issued numerous press releases reflecting Mr. Rappaport's credentials and seeking to capitalize on his good name.

19. Through those releases, TFSB touted Mr. Rappaport's relationship with "the LAPD, SDPD and Homeland Security", along with the many other law enforcement, teachers, healthcare professionals and military service members that Mr. Rappaport already had a business relationship with.

20. TFSB able to entice Mr. Rappaport away from his extremely profitable previous company by inviting him to Calk's headquarters in Chicago.

21. At that meeting, Calk represented to Mr. Rappaport that TFSB held a national charter, which would allow the growth of the platform that Mr. Rappaport had created on a regional level into all 50 states.

22. Calk promised Mr. Rappaport that in that capacity, he would have access to all TFSB resources to expedite the launch of the "extensive planning" that would be required to launch his affinity lending platform on a national scale.

23. Calk stated that Mr. Rappaport's income would increase tenfold.

24. Mr. Rappaport was promised to be an "equity partner" with the owners of TFSB, including Calk.

25. In that capacity, Mr. Rappaport was told he would share in all of the profits and losses of his affinity lending division.

26. The problem with TFSB's representations is that they were elusive, misleading, and ultimately false.

3

27. At the time the representations were made by TFSB, and until approximately early 2018, Mr. Rappaport was unaware of the falsity of the statements by Calk and TFSB.

28. Upon his transition to TFSB, Mr. Rappaport began working on the design, construction and implementation of the Affinity Lending Division for the bank, which would be the first of its kind for TFSB.

29. Mr. Rappaport began constructing this division from scratch, looking to recruit talent and work on everything from the creation, mechanics and rollout of the affinity lending website for TFSB, while at the same time maintaining his level of marketing to ensure that the Affinity Lending Division continued to earn revenue.

30. In late 2016, Mr. Rappaport met with leaders of TFSB, including Calk, to present projections, concerns, and plans for the Affinity Lending Division. Based on those conversations, Mr. Rappaport was advised to "keep up the good work."

31. Around that same time, Mr. Rappaport began raising concerns with the operation of TFSB as it dealt with affinity lending, and in particular, the pricing, protocols, and employee compensation structures.

32. When Mr. Rappaport first raised the issue with John Calk, the Vice-Chairman of TFSB, he was warned "do not go there."

33. Over time, the lack of transparency that TFSB had with its "partners" such as Mr. Rappaport, as well as its customers, became of grave concern to Mr. Rappaport.

34. Another concern was employee compensation, and in particular, the payment of overtime wages to affinity lending employees.

35. In late 2016 or early 2017, Mr. Rappaport old Calk he was concerned about not paying overtime to certain bank employees.

36. In response to Mr. Rappaport's concerns, Calk responded by saying "make them all [expletive] outside salespeople, the last thing I [expletive] need is another FLSA lawsuit."

4

37. Mr. Rappaport protested such characterization of the employees, yet TFSB re-characterized all of the employees of the Affinity Lending Division to outside (commissioned) salespeople, while still requiring them to report to the physical office locations of TFSB and still charging the Affinity Lending Division the costs as if they were onsite employees.

38. In 2017, the Affinity Lending Division was ready to launch for TFSB. Mr. Rappaport presented the platform to TFSB executives and was told it was "excellent."

39. In late 2017, Mr. Rappaport continued to work on rolling out the Affinity Lending Division for TFSB, while simultaneously operating and marketing the division.

40. As he was doing these multi-faceted activities, Mr. Rappaport became concerned with issues that were appearing in multiple areas such as construction lending, recruitment, employees, pricing policies, and secondary marketing, to name a few.

41. He raised these concerns with TFSB management a number of times over a short period, seeking clarification and assistance in order to move things forward. In each instance, these requests were refused or rebuffed by TFSB executives, including Calk.

42. An additional concern that Mr. Rappaport had with the operation of TFSB was Calk's role as a member of the economic advisory team for Donald Trump early into his presidency, and, of more concern, the later role that TFSB had with Paul Manafort. *See*, e.g., https://www.americanbanker.com/news/the-community-banker-who-got-tangled-up-in-the-russia-probe, last visited April 26, 2018.

43. Upon information and belief, TFSB made around $16 million in mortgage loans to Paul Manafort in 2016 and early 2017.

44. At the time of the Manafort loan, TFSB only had assets of approximately $300 million.

45. The loans to Mr. Manafort represented a significant portion of the liquid assets of the bank.

5

46. Mr. Rappaport was seriously concerned about the activities of Calk and how they impacted TFSB.

47. It is believed that members of the Board of Directors for TFSB resigned as a result of Calk's politically-motivated lending activities.

48. Unfortunately, during this same time that Mr. Rappaport raised his concerns with the operational activities of TFSB, Mr. Rappaport developed health complications due to having Polycythemia Vera, a form of chronic leukemia.

49. In early February 2018, his illness forced Mr. Rappaport to take medical leave pursuant to the Family Medical Leave Act ("FMLA") for a period of about two weeks.

50. His treating medical center, the Mayo Clinic, put conditions of his leave in writing, and that writing was provided to TFSB.

51. Despite providing more than the legally necessary paperwork, including giving Calk the date, time and location of his next medical appointment, TFSB still failed to properly accommodate Mr. Rappaport's medical condition.

52. Calk terminated Mr. Rappaport by email sent to February 15, 2018 at 7:40:26 AM.

53. In that email, Calk stated the following:

> Jason,
> After repeated requests for you to adhere to company directives, policies and procedures I have concluded that you either refuse to do so or simply choose not to adhere to them. I accept your resignation from the company and you are terminated as an employee of The Federal Savings Bank effective immediately. Your personal effects will be boxed up and arrangements will be made for you to pick them up from the Scottsdale Loan Production Office. You are prohibited from entering any facility of The Federal Savings Bank and all material and equipment

6

1    belonging to The Federal Savings Bank must be returned to the
2    Scottsdale facility within 24 hours.

3   54.   TFSB terminated Mr. Rappaport after receiving notice of his necessary medical treatment, along with notification to TFSB of significant procedural and process defects in their lending and compensation practices.

4   55.   The termination of Mr. Rappaport came while Mr. Rappaport was entitled to a FMLA leave of absence.

5   56.   The termination of Mr. Rappaport also came in response to questions from Mr. Rappaport to Calk about Rappaport's "inability to obtain clarity regarding our divisions [sic] goals, tools, latitude and future."

6   57.   The termination notice from Calk states that TFSB had engaged in "repeated requests for you [Mr. Rappaport] to adhere to company directives, policies and procedures", but no such request had ever been made in any meaningful way.

7   58.   Calk also wrote to Mr. Rappaport that he accepted his "resignation from the company" but Rappaport had never resigned.

8   59.   Upon termination, Mr. Rappaport was barred by Calk from returning to his office to recover his personal property apart from picking up a pre-packaged box.

9   60.   Mr. Rappaport sent his parents to pick up his property from TFSB.

10  61.   When his parents arrived at TFSB, they were given a box of items from a TFSB employee who advised them that they were being given all of Mr. Rappaport's personal property.

11  62.   TFSB failed to return a number of items of Mr. Rappaport's personal property back to him, including a laptop computer and three flash drives containing years of proprietary banking information from his time with ICC.

## Count One

### (Defamation)

63.   Incorporate by reference all of the prior allegations as if alleged here.

7

64. Since his termination on February 15, 2018 by Calk, TFSB has made false and defamatory statements about Mr. Rappaport to not less than ten different people and/or organizations, many of whom had previously done business with Mr. Rappaport.

65. TFSB also communicated defamatory information regarding Mr. Rappaport to current, former, and potential co-workers and referral sources for his business.

66. Those people whom TFSB has defamed Mr. Rappaport to include officers and faculty members of Columbia University, Rutgers University, affiliates of Arizona State University, Peace Officers Research Association of California (PORAC), the US Customs Office at John F. Kennedy Airport, and the New York City Police Department Columbia Association, among others.

67. In late February and early March 2018, TFSB, through Calk and through a TFSB Employee, made statements of fact to members of the Board of Directors of the New York City Police Department Columbia Association (NYPDCA) regarding Mr. Rappaport.

68. Calk and Mueller also made statements to members of the NYPDCA about Mr. Rappaport.

69. Calk and Muller on behalf of TFSB, stated the following to various persons at the NYPDCA:

   a. Mr. Rappaport "was terminated for cause"

   b. Mr. Rappaport "is unethical, a thief, a liar."

70. Those statements are false.

71. Those statements were intended to "sway the Association into remaining with [TFSB] and to mount a personal attack on Mr. Rappaport."

72. In February or March of 2018, Mueller talked to J.C. Moreno, a Sergeant in the New York Police Department (NYPD) about Mr. Rappaport

8

73. In early March 2018, when Sgt. Moreno was contemplating refinancing his home, he contacted TFSB to get more information from Mr. Rappaport, whom he had known for a number of years.

74. When Sgt. Moreno asked for Mr. Rappaport, the receptionist with TFSB told him to leave his number. He then received a call back from Mr. Mueller.

75. During the call with Mr. Mueller, Sgt. Moreno asked for Mr. Rappaport and was told that Mr. Mueller would be helping him now.

76. Again, Sgt. Moreno asked to speak to Mr. Rappaport directly. In response, Mr. Mueller told Sgt. Moreno that Mr. Rappaport was "terminated for unethical conduct by his boss Steve Calk."

77. Sgt. Moreno asked Mr. Mueller what was meant by that statement, and Mr. Mueller's response was that Mr. Rappaport was "fired for being unethical" and that Sgt. Moreno was better off with him and not working with 'people' like Jason."

78. Sgt. Moreno found the defamatory communications from TFSB to be not only unprofessional, but unacceptable, as he believes that Jason Rappaport has supported and served the NYPD for years.

79. Also in late February and early March 2018, TFSB made deliberately false statements of fact to Columbia University employees regarding Mr. Rappaport.

80. Specifically, Calk contacted Alice Lesman, who is the Director of Work|Life at Columbia University and who has worked with Mr. Rappaport for ten years

81. Calk told Lesman that Mr. Rappaport is "unethical," among other things, and also that he was fired with cause from TFSB.

82. This false and defamatory communication between TFSB and Ms. Lesman resulted in Mr. Rappaport being terminated from the list of approved lenders with Columbia University.

83. Also in late February and early March 2018, TFSB made deliberately false statements of fact regarding Mr. Rappaport to Dr. Kiwon Lee, who was a

9

Columbia University Affinity client in the past who has since been recruited to Rutgers as full professor of neurology and chief of neurology service at Robert Wood Johnson University Hospital in New Brunswick, New Jersey.

84. Dr. Lee has done multiple financial transactions for both his primary home as well as his investment property through Mr. Rappaport, and was continuing to do so with Mr. Rappaport while he was at TFSB.

85. Even though Mr. Rappaport left TFSB, he encouraged Dr. Lee to keep his current construction financing with TFSB, which Dr. Lee did.

86. In connection with that financing, Dr. Lee emailed a question to TFSB. In response to his email, he received a call from Mr. Mueller of TFSB.

87. Before engaging in any conversation regarding the purpose of his telephone call, Mr. Mueller advised Dr. Lee "that he wanted me to know that Jason Rappaport was actually terminated."

88. Mr. Mueller also told Dr. Lee that it was "unethical for Jason to make me change the bank." Dr. Lee explained that Mr. Rappaport was not trying to have him leave TFSB, and in fact had advised him that "it would be best to stick to Federal Saving Bank but he would be happy to assist me in the future if I ever need to refinance that loan."

89. Also in late February and early March 2018, TFSB made deliberately false statements of fact regarding Mr. Rappaport to Brian Marvel, the President of PORAC.

90. Specifically, Calk called Mr. Marvel and told him that Mr. Rappaport was terminated and had acted improperly.

91. TFSB also initiated false and defamatory communications with ASU employees and agents.

92. One of those ASU employees is Oscar Hernandez, who knew about Mr. Rappaport's affinity lending program through ASU and decided to reach out to him when he wanted to purchase a new home.

10

93. Mr. Hernandez stopped into the TFSB location in Scottsdale, and asked to speak with Mr. Rappaport. He was told to wait, and after waiting almost thirty minutes Mr. Mueller came out to talk to him. Mr. Mueller told Mr. Hernandez that TFSB had "fired Mr. Rappaport for unethical conduct and that I would be dealing with him now." Mr. Mueller also told Mr. Hernandez to "ignore all calls and communications with Mr. Rappaport and that he was under investigation."

94. These communications from Mr. Mueller to Mr. Hernandez were very troubling to him, and caused him to look to other financial institutions for his financing needs.

95. The persons and organizations identified in Paragraphs 64-94 as having received defamatory communications from TFSB are some of those who contacted Mr. Rappaport and let him know about the defamation. Upon information, the actual number of current and potential clients of Mr. Rappaport to whom TFSB made false and defamatory statements about Mr. Rappaport is much higher.

96. In addition to current and potential clients of Mr. Rappaport that TFSB has chosen to speak about him in a defamatory light, TFSB has also defamed Mr. Rappaport to his former colleagues such as Sean Caulfield and TFSB employees and contractors in the Northeast and Southwest Region.

97. Upon information and belief, TFSB sent an email to Mr. Rappaport's entire region defaming his professional reputation.

98. The statements identified in Paragraphs 64-94 were made by and on behalf of TFSB regarding Mr. Rappaport.

99. The Statements bring Mr. Rappaport into disrepute, contempt or ridicule and impeach the integrity, reputation, capability and good name of Mr. Rappaport, in that, among other things, they accuse Mr. Rappaport of being unethical, a liar and a thief, and being subject to criminal and regulatory investigations.

100. Each of the Statements and the combination of the Statements are factually false and, to the extent any of the Statements appear to convey an opinion,

11

1  they are actionable because they imply the existence of additional undisclosed facts
2  which are false.

3      101.    TFSB is liable not only for what was said, but also for what was
4  insinuated.

5      102.    TFSB made each and every Statement knowing they were false. In the
6  alternative, TFSB acted in reckless disregard of the truth in making the Statements; in
7  the alternative, TFSB was negligent in failing to ascertain the truth of the Statements
8  before making them, and further so by failing to correct the false statements which were
9  published.

10      103.    Each and all of the Statements were published by TFSB by reason of evil
11  motives and/or malice towards Mr. Rappaport and were and are intended and designed
12  to and did injure and defame and continue to injure and defame Mr. Rappaport.

13      104.    The Statements injure Mr. Rappaport's trade or business and are,
14  therefore, slanderous per se, thereby relieving Mr. Rappaport of the need to plead or
15  prove special damages.

16      105.    In addition, and notwithstanding the foregoing, the acts and conduct of
17  TFSB, as set forth above, have caused Mr. Rappaport to incur damages.

18      106.    Mr. Rappaport has lost income and benefits in an amount yet to be fully
19  ascertained

20      107.    Mr. Rapaport has also suffered loss of reputation.

21      108.    Mr. Rappaport has suffered emotional destress, and physical and mental
22  damages, in addition to the presumed damages, in an amount to be proven at trial.

23      109.    TFSB's acts and conduct described above evidence an evil mind, in that
24  such acts and conduct were willful, malicious and performed with the intent to harm Mr.
25  Rappaport or with a conscious disregard for the truth or falsity of the Statements and
26  with a conscious disregard of the likelihood of such harm. Mr. Rappaport is therefore
27  entitled to an award of substantial punitive damages.

28

## Count Two

### (False Light)

110. Mr. Rappaport reasserts and realleges all prior allegations.

111. A false light claim and cause of action arises when untrue information has been published about an individual or when true information has been published about an individual that creates a false implication about the individual.

112. TFSB's actions were highly offensive to Mr. Rappaport and, indeed, would be highly offensive to any reasonable person because they deliberately, for personal gain, and falsely portrayed Mr. Rappaport as unethical and dishonest, and thus jeopardized both his personal and professional reputation and his ability to earn a living.

113. TFSB acted with actual malice in portraying Mr. Rappaport in a false light.

114. TFSB's actions have impeached and continue to impeach Mr. Rappaport's personal and professional reputation, competency and integrity and have subjected him to ridicule in the eyes of his friends, acquaintances, business associates and the general public worldwide.

115. TFSB's actions have also caused Mr. Rappaport to suffer severe and ongoing emotional distress.

116. TFSB's actions were willful, wanton and malicious and specifically calculated to cause harm to Mr. Rappaport without regard for the consequences of their conduct and, accordingly, Mr. Rappaport is entitled to an award of punitive damages to punish TFSB and to deter others from engaging in such conduct.

117. As a direct and proximate result, without limitation, Mr. Rappaport has suffered and has continued to suffer severe emotional distress and suffer significant both presumed and actual damage to his reputation and business in an amount to be proved at trial.

## Count Three

### (Intentional Interference With Business Expectancies)

118. Mr. Rappaport reasserts and realleges all prior allegations.

119. TFSB took affirmative steps to cause current clients of Mr. Rappaport to terminate their business relationship with him, and to cause potential clients of Mr. Rappaport to choose not to do business with him.

120. Mr. Rappaport had and has prospective and actual contracts with his current and potential clients.

121. By virtue of their treatment of numerous clients who also worked with Mr. Rappaport, TFSB had actual knowledge as to the existence of these business relationships.

122. TFSB intentionally interfered with Mr. Rappaport's business relationships.

123. TFSB's conduct was improper.

124. As a direct and proximate result of TFSB' conduct, Mr. Rappaport has suffered damages in an amount to be proven at trial.

125. TFSB's acts and conduct described above evidence an evil mind, in that such acts and conduct were willful, malicious and performed with the intent to harm Mr. Mr. Rappaport. Mr. Rappaport is therefore entitled to an award of substantial punitive damages.

## Count Four

### (Declaratory Judgment)

126. Mr. Rappaport reasserts and realleges all prior allegations.

127. An actual controversy has arisen and exists between Mr. Rappaport and TFSB as to the truth or falsity of the information that TFSB has been conveying to numerous third parties regarding Mr. Rappaport.

128. Mr. Rappaport desires a judicial declaration that (1) he was not terminated from TFSB for cause; (2) he did not act unethically while employed by TFSB or in any

14

other manner working as an affinity lender; (3) he was and is not under investigation by TFSB or any regulatory or governmental agency; and (4) he is not a thief or a liar.

## Count Five

### (FMLA)

129. Mr. Rappaport reasserts and realleges all prior allegations.

130. "The FMLA entitles covered employees to up to twelve weeks of leave each year for their own serious illnesses or to care for family members, and guarantees them reinstatement after exercising their leave rights." *Bachelder v. Am. W. Airlines, Inc.,* 259 F.3d 1112, 1119 (9th Cir. 2001) *citing* 29 U.S.C. § 2612; 2614(a)(1).

131. Calk is an "employer" within the meaning of the FMLA because his above described actions were believed to have been performed in the interest of the employer. *Bonzani v. Shinseki*, 895 F. Supp. 2d 1003 (E.D. Cal. 2012).

132. Calk is therefore personally liable under the FMLA because he acted directly or indirectly in the interest of TFSB.

133. "The right to reinstatement guaranteed by 29 U.S.C. § 2614(a)(1) is the linchpin" of the FMLA. *Sanders v. City of Newport*, 657 F.3d 772, 778 (9th Cir. 2011).

134. "[E]vidence that an employer failed to reinstate an employee who was out on FMLA leave to h[is] original (or an equivalent) position establishes a prima facie denial of the employee's FMLA rights." *Id.*

135. The employer's lack of intent to retaliate is not relevant. *Sanders v. City of Newport*, 657 F.3d 772, 778 (9th Cir. 2011) ("In interference claims, the employer's intent is irrelevant to a determination of liability.").

136. An employee who is denied reinstatement must establish that: (1) he was eligible for the FMLA's protections, (2) his employer was covered by the FMLA, (3) he was entitled to leave under the FMLA, (4) he provided sufficient notice of his intent to take leave, and (5) his employer denied him FMLA benefits to which he was entitled. *Id*

137. Mr., Rappaport can prove all of the elements above.

15

(1) He was eligible for the protections of the FMLA because he worked the required number of hours in the 12 months before he requested leave.

(2) TFSB is a covered employer under the FMLA because it employed 50 or more employees within a 75 mile radius.

(3) Mr. Rappaport was entitled to FMLA leave.

(4) He provided notice of his intent to take leave and was granted leave or should have been granted leave.

(5) TFSB denied Mr. Rappaport the benefits to which he was entitled by terminating him while he was on leave.

138. A mandatory award of attorney fees.[1]

## Count Six

### (PTSO)

139. Mr. Rappaport reasserts and realleges all prior allegations.

140. Defendants have retaliated against Rappaport as that term is defined in A.R.S. § 23-364(A), in violation of A.R.S. § 23-364(B) and in violation of A.R.S. § 23-374(B).

141. As such, Defendants are liable to Mr. Rappaport for an amount "sufficient to compensate the employee and deter future violations, but not less than one hundred fifty dollars for each day that the violation continued or until legal judgment is final." A.R.S. § 23-364(G)

142. Defendants terminated Rappaport within 90 days of his taking sick leave.

143. Defendants must, therefore, As such they must also prove, by clear and convincing evidence that they had a permissible reason for terminating Rappaport, all pursuant to A.R.S. § 23-364(B)

---

[1] 29 U.S.C. § 2617 (mandating these types of damages to prevailing employee).

WHEREFORE, Plaintiff Jason E. Rappaport requests that Judgment be entered in his favor and against Defendants The Federal Savings Bank and Stephen M. Calk, jointly and severally, as follows:

    A.    For compensatory damages

    B.    For actual damages in an amount to be proven at trial;

    C.    For a declaration that (1) Mr. Rappaport was not terminated from TFSB for cause; (2) Mr. Rappaport did not act unethically while employed by TFSB or in any other manner working as an affinity lender; (3) Mr. Rappaport was and is not under investigation by TFSB or any regulatory or governmental agency; and (4) Mr. Rappaport is not a thief or a liar;

    D.    For pre-judgment and post-judgment interest at the highest legal rate;

    E.    For punitive damages in an amount sufficient to punish Defendant for its wrongful conduct, and to discourage similar wrongful conduct from persons similarly situated;

    F.    For costs and attorney fees, together with interest at the highest legal rate from the date of judgment until paid in full; and

    G.    For such other and further relief as is proper and just.

## Request For Trial By Jury

Pursuant to Rule 38, Fed. R. Civ. P., Plaintiff Jason E. Rappaport requests a trial by jury on all issues so triable.

DATED this 7th day of May, 2018.

**Jaburg & Wilk, P.C.**

/s/Kraig J. Marton
Kraig J. Marton
Laura Rogal
3200 N. Central Avenue, 20th Floor
Phoenix, AZ 85012
Attorneys for Plaintiff